# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SPIRIT BANK CORP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-CV-81-TCK-FHM |
| | ) |
| WARNER AVIATION, LTD., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court are Plaintiff Sprit Bank Corporation's ("Spirit Bank") Motion for Partial Summary Judgment (Doc. 45) and Defendant StarNet Insurance Company's ("StarNet") Motion for Summary Judgment (Doc. 46).

**I.     Background**

Spirit Bank is a domestic banking corporation organized and conducting business in Oklahoma, with its principal place of business and corporate headquarters in Tulsa, Oklahoma. StarNet is a foreign insurance company licenced and doing business in Oklahoma. StarNet issued Aircraft Insurance Policy No. BA09A1691S ("the Policy") to Sprit Bank. The Policy provided insurance for a 2003 Piper Aircraft ("the Aircraft") from November 20, 2009 to November 20, 2010, including "Physical Damage Coverage" at an insured value of $1,300,000.00.

On or about November 23, 2009, Spirit Bank repossessed the Aircraft in Akron, Ohio from a defaulting borrower.[1] The Aircraft did not have a current Airworthiness Certificate because it was

---

[1] Spirit Bank's Petition alleges that it issued a purchase money loan to Defendant Warner Aviation for the purchase of the Aircraft. As part of the transaction, Defendant Allen Warner ("Warner"), as President of Warner Aviation, executed a Commercial Promissory Note in the amount of $1,490,461.21, payable to Spirit Bank. Spirit Bank alleges that the Commercial

past due for its annual inspection and therefore could not be flown without obtaining a ferry flight permit.[2] John Hogarth ("Hogarth"), a licensed aircraft mechanic, conducted a ferry permit inspection of the Aircraft on or about November 23, 2009. Hogarth testified that during his inspection, he did not see "any evidence of any visible exterior damage to the outer skin of the upper side of the [Aircraft's] wings." (Hogarth Dep., Ex. 5 to Pl.'s Mot. for Partial Summ. J. at 13:18-22; *see also id.* at 20:8-13 (stating there "was no damage to [the Aircraft] when I did the ferry permit inspection" and that "[t]here was no wrinkling [on the wings] present"); Hogarth Aff., Ex. 4 to Pl.'s Mot. for Partial Summ. J. (stating same).)

Upon completing his inspection, Hogarth issued a ferry flight permit, which authorized the Aircraft to fly from Akron, Ohio to Jenks, Oklahoma. (*See* Ferry Flight Permit, Ex. D to StarNet's Mot. for Summ. J.) Jonathan Storms ("Storms") and Shawn Vickers ("Vickers") then flew the Aircraft to Jenks on November 23, 2009 pursuant to such permit ("November flight"). The record contains various pieces of evidence relating to the purpose of the November flight. First, the ferry flight permit indicates that the purpose of the flight was "maintenance." (*Id.*) Second, Becky Goumaz ("Goumaz"), Senior Vice President of Spirit Bank, provided deposition and affidavit testimony regarding the purpose of the November flight. During her deposition, Goumaz was asked if the "purpose of the first flight . . was for the purpose of repossessing the plane for Spirit Bank,"

---

Promissory Note was not paid according to its terms, therefore making Defendants Warner, Warner Aviation, and Warner Industries (collectively "Warner Defendants") in default and resulting in the repossession of the Aircraft.

[2] A ferry flight permit is a document that allows an aircraft to fly when it does not currently meet applicable airworthiness requirements. (*See* Vickers Dep., Ex. C to StarNet's Mot. for Summ. J. at 75:15-25, 77:1-5.)

2

and Goumaz responded, "yes." (Goumaz Dep., Ex. C to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 19:9-13.) She was then asked if "there [was] any other purpose of that flight," and responded, "no." (*Id.* at 19:14-16.) In an affidavit dated October 13, 2011, Goumaz testified as follows:

> Because the annual inspection for the [A]ircraft was not current at the time of the repossession, Spirit Bank requested the issuance of a "ferry flight permit" to authorize the flight of the [A]ircraft from Akron to Tulsa (Richard Lloyd Jones Airport in Jenks, Oklahoma) for preliminary inspection and any necessary maintenance, and in order to determine and make arrangements with a qualified facility to perform the required annual inspection, in order to achieve a reinstatement of the [A]ircraft's airworthiness certificate.

(Goumaz Aff., Ex. 1 to Pl.'s Mot. for Partial Summ. J. at 2 ("First Goumaz Affidavit").) In a subsequent affidavit attached as an exhibit to Plaintiff's response to StarNet's Motion for Summary Judgment, Goumaz testified that "[t]he sole purpose [of the November flight] was to have the annual inspection performed and the airworthiness certificate reinstated, so that the bank could proceed in its effort to sell the [Aircraft][.]" (Goumaz Aff., Ex. 1 to Pl.'s Resp. to StarNet's Mot. for Summ. J. at 2 ("Second Goumaz Affidavit").) Goumaz also testified therein that repossession took place in Akron, Ohio, before the Aircraft flew to Jenks. (*Id.* at 2.) Finally, Storms testified he had made arrangements for a facility in Jenks to conduct an annual inspection of the Aircraft upon its arrival. (Storms Aff., Ex. 2 to Pl.'s Resp. to StarNet's Mot. for Summ. J. at 1.)

After the Aircraft arrived in Jenks, Goumaz was advised that, although the Aircraft could be inspected at the facility in Jenks, Mead Aviation Services ("Mead Aviation"), located in Hutchinson, Kansas and owned by Kevin Mead ("Mead"), was the most qualified facility to inspect the Aircraft. On or about December 8, 2009, a second ferry flight permit was issued, allowing the Aircraft to be

3

flown from Jenks, Oklahoma to Hutchinson, Kansas.[3]  Storms and Vickers then flew the Aircraft to Hutchinson, Kansas on December 17, 2009 ("December flight").  The parties again cite to various pieces of testimony relating to the purpose of the December flight.  According to Goumaz's testimony in the First Goumaz Affidavit, the Aircraft was flown to Hutchinson, Kansas "for the required annual inspection."  (First Goumaz Aff., Ex. 1 to Pl.'s Mot. for Partial Summ. J. at 3.)  Goumaz further testified in her deposition that Spirit Bank "felt like if [they] got the annual inspection from Mead, that [they] would have a more - the most marketable plane [they] could have."  (Goumaz Dep., Ex. C to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 24:24 – 25:6-9.)  Further, Mead testified that the Aircraft came to his facility for the annual inspection and a pre-purchase inspection.  (Mead Dep., Ex. B to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 17:12-16.)  Mead additionally explained:

> [T]he big difference [between an annual inspection and a pre-purchase inspection] [is that] the pre-purchase inspection is not as detailed as the annual inspection, but sometimes buyers will kind of combine them.  Just mainly it's terminology at that point, but to do the – ultimately we were doing an annual inspection.

(*Id.* at 17:17-25.)  Finally, Storms' affidavit states that the Aircraft "was flown to Mead Aviation . . . for the annual inspection," (Storms Aff., Ex. 2 to Pl.'s Resp. to StarNet's Mot. for Summ. J. at 2), and Storms testified in his deposition that the Aircraft was flown to Mead Aviation for both a

---

[3] The summary judgment record suggests that the Aircraft was appraised on or about December 9, 2009, although information regarding this appraisal is somewhat incomplete.  Goumaz's deposition testimony suggests such an appraisal took place, but the portions of Goumaz's deposition provided by the parties do not provide any details about the appraisal.  (*See* Goumaz Dep., Ex. H to StarNet's Mot. for Summ. J. at 3-25.)  Further, Mead's deposition references photographs of the Aircraft taken by an appraiser before the Aircraft arrived at Mead Aviation.  (Mead Dep., Ex. B to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 28:7-17.)  Again, however, no additional information is provided in the summary judgment record as to the earlier photographs or the referenced appraisal.

4

"prebuy inspection" and an "annual inspection," (Storms Dep., Ex. A to StarNet's Reply in Support of Mot. for Summ. J. at 43:22-25 – 44:1-5).

Once the Aircraft arrived at Mead Aviation, Mead conducted a preliminary "walk around" inspection of the Aircraft. During this inspection, Mead discovered "wrinkling" on the left and right wing skins. Mead testified that he had seen wrinkling on other planes approximately four to five times in his career, which had been caused after the planes encountered in-flight turbulence at high speeds. (Mead Dep., Ex. D to StarNet's Reply in Support of Mot. For Summ. J. at 26:3-25 – 27:1-22.) Both Storms and Vickers testified, however, that they did not experience any turbulence during the November or December flight. (*See* Storms Dep., Ex. D to StarNet's Resp. to Spirit Bank's Mot. for Partial Summ. J. at 37:15-19 (stating no turbulence occurred during either flight), 38:1-4 (agreeing that, to his knowledge, nothing occurred during either flight that would have caused wrinkling on the Aircraft's wing skins); Vickers Dep., Ex. B. to StarNet's Reply in Support of Mot. for Summ. J. at 31:11-14 (testifying there was no turbulence on either flight); Vickers Dep., Ex. E to StarNet's Resp. to Spirit Bank's Mot. for Partial Summ. J. at 73:5-9 (testifying that nothing occurred during either flight that would have caused wrinkling on the skins of the Aircraft).)

Hogarth, who conducted the first ferry permit inspection of the Aircraft in Akron, Ohio, was later shown photographs of the skin wrinkling discovered by Mead and testified that "[t]he visible wrinkling of the exterior skin of the upper side of the [A]ircraft's wings that is depicted in these photographs did not exist at the time of my ferry permit inspection [on November 23, 2009]." (Hogarth Aff., Ex. 4 to Pl.'s Mot. for Partial Summ. J.; *see also* Hogarth Dep., Ex. 5 to Pl.'s Mot. for Partial Summ. J. at 19:20-25 – 20:1-13.)

5

As a result of the wrinkling on the Aircraft's wing skins, Spirit Bank alleges that it gave notice and proof of loss to StarNet on April 6, 2010. Spirit Bank thereafter brought suit against StarNet, alleging a breach of contract claim for "failing and refusing to acknowledge coverage and pay . . . Spirit Bank for [the] physical damage" to the Aircraft. Spirit Bank also brought a claim for declaratory judgment against StarNet, seeking a declaration that: (1) the skin wrinkling constitutes "physical damage" under the Policy; (2) the damage occurred during the term of the Policy; and (3) StarNet is therefore liable to Spirit Bank for the physical damage to the Aircraft.[4][5] The parties have filed cross motions for summary judgment on both claims.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and

---

[4] These claims were initially brought against two additional insurance companies -- namely, Federal Insurance Company ("Federal") and U.S. Speciality Insurance Company ("USSIC"). Plaintiff subsequently dismissed all claims against Federal and USSIC, however. (*See* Doc. 36.)

[5] Spirit Bank's Petition also alleges two claims against the Warner Defendants: (1) action on note; and (2) breach of contract. To date, the Warner Defendants have not entered an appearance or filed an official Answer. Rather, in a letter dated April 14, 2011 to the Court Clerk, Warner stated as follows: "Please be advised that Warner Aviation, Ltd. and Warner Industries Inc. are no longer active and have no assets. Allen C. Warner was not signed personally on any loan documents." (4/14/11 Warner Letter.) On May 18, 2011, Spirit Bank filed a Motion for Entry of Default by the Clerk as to the Warner Defendants, which was denied by the Court Clerk because the April 14, 2011 letter from Warner could "possibly constitut[e] otherwise defend under Federal Rules [sic] of Civil Procedure 55." (5/25/11 Court Clerk Minute Order.) Spirit Bank has not filed any subsequent motion with regard to the Warner Defendants.

6

draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

The relevant legal standard does not change where the parties file cross motions for summary judgment, and each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). However, "[b]ecause the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof[,] and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharm., Inc., Sec. Litig.*, 209 F. Supp. 2d 1106, 1112 (D.Colo. 2002) (citing *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) and *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another")).

### III. Spirit Bank's Motion for Partial Summary Judgment

Spirit Bank moves for summary judgment on its claims against StarNet, arguing that the skin wrinkling on the Aircraft constitutes "physical damage" under the Policy and that the skin wrinkling damage occurred during the Policy period. StarNet objects, contending that: (1) Spirit Bank has failed to meet its burden that the damage to the Aircraft's wings occurred during the Policy period;

7

(2) the damage to the Aircraft falls within an exception in the Policy; and (3) Spirit Bank has failed to meet certain conditions precedent that are necessary for coverage under the Policy.

Upon review of the record and the parties' arguments, the Court finds that even if Spirit Bank's claims were able to withstand StarNet's second and third arguments, as outlined above, Spirit Bank is not entitled to summary judgment because a genuine issue of material fact exists as to when the wrinkling on the wing skins occurred. Specifically, Spirit Bank's contention that the damage occurred during the Policy period is based on (1) Hogarth's testimony that he did not view any wrinkling on the wing skins when he inspected the Aircraft on November 23, 2009, and (2) Mead's testimony that he viewed such damage on December 17, 2009. StarNet refutes this evidence, however, by citing to the testimony of Storms and Vickers, wherein they testified that (1) they did not experience turbulence on the November or December flight, and (2) nothing occurred during either flight which would have caused wrinkling to the Aircraft's wing skins. StarNet also questions the accuracy of Hogarth's inspection, citing Hogarth's testimony that he only performs ferry flight permit inspections once or twice a year and had only seen skin wrinkling on a plane twice during his career. In sum, the question of when the damage to the Aircraft occurred is one of disputed fact. Although Hogarth and Mead's testimony, when read together, could suggest that the damage occurred sometime between November 23, 2009 and December 17, 2009, the testimony from Vickers and Storms, wherein they stated that nothing occurred during their flights to cause wrinkling, casts doubt on such a conclusion. This question of fact is best left to a jury after presentation of evidence and witnesses, and the Court therefore denies Spirit Bank's Motion for Partial Summary Judgment.

**IV.    StarNet's Motion for Summary Judgment**

StarNet moves for summary judgment on Spirit Bank's claims against it, arguing that the damage to the Aircraft falls within an exception in the Policy.[6] The Policy states as follows:

> EXCLUSIONS
>     This policy does not apply: . .
>
>     2.    To any insured while the aircraft is in flight
>           . . .
>
>           (c)    If the Airworthiness Certificate of the aircraft is not in full force and effect [("Exclusion 2(c)")].
>
>     . . .
>
> Exclusion 2(c) shall not apply while the aircraft is operated on a reposition, ferry or test flight provided a special permit or waiver has been granted by a government aviation authority for such flights and such flights are for the sole purpose of reinstatement or renewal of the Airworthiness Certificate [("Exclusion 2(c) exception")].

(Policy, Ex. B to StarNet's Mot. for Summ. J. at 3.) StarNet argues that pursuant to Exclusion 2(c), the Policy does not provide coverage for the damage to the Aircraft's wing skins because the Aircraft did not have an updated Airworthiness Certificate during the November or December flight. StarNet further contends that the Exclusion 2(c) exception does not require coverage because the November and December flights were not completed for the "sole purpose of . . . renewal of the Airworthiness Certificate." (*Id.*) Rather, citing various portions of deposition testimony, StarNet argues that the purpose of the November flight was "for transporting the [Aircraft] from Ohio to

---

[6] In the introductory paragraph of its Motion for Summary Judgment, StarNet also states that "StarNet is entitled to judgment as a matter of law due to Spirit Bank's failure to comply with the terms and conditions of the Policy." (StarNet's Mot. for Summ. 1.) However, this is the only reference to such an argument in StarNet's Motion for Summary Judgment. Therefore, it appears that StarNet has abandoned this argument as a ground for summary judgment, and the Court will not address it.

9

Oklahoma for repossession." (StarNet's Mot. for Summ. J. 7). StarNet further argues that the December flight had a dual purpose – namely, completion of an "annual inspection and a potential buyer's pre-buy inspection." (*Id.*) Therefore, according to StarNet, because neither flight's *sole* purpose was the renewal of the Airworthiness Certificate, Exclusion 2(c) applies and prevents coverage in this case.

The Court again finds genuine issues of disputed fact that prevent summary judgment on this issue. Specifically, the following evidence exists in the record with regard to the purpose of the November flight: (1) the ferry flight permit, which states that the purpose of the flight was "maintenance"; (2) Storms' testimony that he had made arrangements for a facility in Jenks to conduct an annual inspection of the Aircraft upon its arrival; (3) Goumaz's deposition testimony that the November flight was "for the purpose of repossessing the plane for Spirit Bank," (Goumaz Dep., Ex. C to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 19:9-13); (4) the First Goumaz Affidavit, which states that the purpose of the November flight was for "preliminary inspection and any necessary maintenance, and in order to determine and make arrangements with a qualified facility to perform the required annual inspection," (First Goumaz Aff., Ex. 1 to Pl.'s Mot. for Partial Summ. J. at 2); and (5) the Second Goumaz Affidavit, which states that "[t]he sole purpose for [the November flight] was to have the annual inspection performed and the airworthiness certificate reinstated, so that the bank could proceed in its effort to sell the [Aircraft]," (Second Goumaz Aff., Ex. 1 to Pl.'s Resp. to StarNet's Mot. for Summ. J. at 2).

StarNet argues that the Second Goumaz Affidavit should be disregarded for the purpose of determining its Motion for Summary Judgment because it constitutes a sham affidavit. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (stating "courts will disregard an [affidavit that

10

conflicts with the affiant's prior sworn statements] when they conclude that it constitutes an attempt to create a sham fact issue" and outlining certain factors relevant to the existence of a sham fact issue). The Court finds it unnecessary to reach this issue, however, because even without considering either of Goumaz's affidavits, the remaining evidence – namely, the ferry flight permit, Storms' affidavit testimony, and Goumaz's deposition testimony – demonstrate the existence of a material fact as to the purpose of the November flight, as each piece of evidence indicates a different purpose behind the flight. The Court therefore declines to grant StarNet's Motion for Summary Judgment based on the purpose of the November flight.

Similarly, StarNet has not met its burden of showing that no genuine issue of material fact exists with regard to the purpose of the December flight. Although some testimony suggests that the Aircraft was flown to Hutchinson for an annual *and* pre-sale inspection, (*see* Storms Dep., Ex. A to StarNet's Reply in Support of Mot. for Summ. J. at 43:22-25 – 44:1-5 (stating Aircraft was flown to Mead Aviation for both a "prebuy inspection" and an "annual inspection")), other testimony suggests that the true purpose of the December flight was the completion of an annual inspection, (*see* Mead Dep., Ex. B to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 17:17-25 (stating that "ultimately, [they] were doing an annual inspection"); First Goumaz Aff., Ex. 1 to Pl.'s Mot. for Partial Summ. J. at 3 (stating purpose of December flight was to obtain annual inspection from Mead Aviation); Goumaz Dep., Ex. C to StarNet's Resp. to Pl.'s Mot. for Partial Summ. J. at 24:24 – 25:6-9 (stating Goumaz wanted to get the annual inspection from Mead Aviation in order to have the most marketable plane)). Therefore, a genuine issue of fact exists with regard to the purpose of the December flight, making this issue inappropriate for summary adjudication as well.

## V. Conclusion

For the reasons outlined herein, Spirit Bank's Motion for Partial Summary Judgment (Doc. 45) and StarNet's Motion for Summary Judgment (Doc. 46) are DENIED.

**DATED this 1st day of February, 2012.**

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**